UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA          3-03-cr-00057 (JCH)

-v-

MILDRED MILLER

---

## DEFENDANT'S SENTENCING MEMORANDUM

I. Introduction

This case has been remanded to this Court for re-sentencing in conformity with United States v. Booker, 543 US. 220 (2005) and United States v. Fagans, 406 F.3d 138 (2d Cir. 2005) by an Order of the United States Court of Appeals for the Second Circuit, United States of America v. Mildred Miller, 178 Fed. Appx. 70; 2006 U.S. App LEXIS 10692 (April 26, 2006). Mildred Miller's appointed counsel submits this memorandum in support of Ms. Miller's application for a non-guideline sentence reflecting a number of factors listed in 18 U.S.C. § 3553 (a).

II. History of the Case

A. Offense of Conviction

From 1996 to 2002, Ms. Miller owned and operated A-1 Staffing/M.K.M. Professional Recruiters, a temporary employment agency in Hartford, Connecticut. [PSR ¶ 8] Because of Ms. Miller's longstanding compulsive gambling disorder, her business was in serious financial distress Upon the advice of a local attorney,

1

Ms. Miller contacted co-defendant Kevin Morrison, the executive vice president of American Commercial Finance Corporation ["ACFC"]. [Court Exhibit 1 ("Couric Report") at p. 8]. ACFC is a premium lending company or factor. Mr. Morrison was exclusively responsible for ACFC's factoring loans, and assured Ms. Miller that he had an unlimited amount of money available to him for which he was not directly accountable to others. [*Id*.; PSR ¶ 11] Ms. Miller and Mr. Morrison soon commenced a sexual relationship which lasted for a number of years, until 2002. [PSR ¶ 13] Throughout that period of time, Mr. Morrison wired large amounts of money into Ms. Miller's account, often without any supporting documentation or evidence of legitimate receivables from her. [PSR ¶ 15] Ms. Miller has asserted that Mr. Morrison was aware throughout their relationship that she had a serious gambling problem [Couric Report at 8-9] This relationship continued until 2002, when Mr. Morrison confessed to the president of ACFC that he had been manipulating financial information so as to conceal the existence of certain "nonperforming loans." [PSR ¶ 17] The ultimate loss to ACFC and its parent company, HPSC, Inc. as a result of Mr. Morrison's relationship with Ms. Miller was $4,765,898. It appears that the funds were largely "used and lost for gambling at the Connecticut casinos and in other legal gambling venues." [Plea Agreement at 8] Morrison also pleaded guilty, but unlike Ms. Miller, he received a sentence of only 16 months. [PSR ¶ 3].

B. <u>Ms Miller's Initial Sentencing Proceeding</u>

A Pre-sentence Report ["PSR"] was prepared which computed a total offense level of 22. The criminal history score totaled 9. Ms. Miller was therefore placed in category IV, resulting in a guideline imprisonment range of 63-78 months. The PSR recommended no grounds for departure other than that Ms. Miller receive the full 3 points for prompt acceptance of responsibility.

Prior to sentencing, Ms. Miller moved for a downward departure based on U.S.S.G. § 5K2.13, on the ground that she committed the offense while suffering from a significantly reduced mental capacity. Attached to the motion was an intake report from the Wheeler Clinic, dated 4/21/03, which evaluated Ms. Miller at the request of the Probation Department. The Axis I diagnosis in the report was pathological gambling and generalized anxiety disorder.

Pursuant to an Order of this court, Ms. Miller received a comprehensive psychiatric evaluation and assessment of her gambling behavior and need for ongoing psychiatric treatment at the Yale University School of Medicine. On November 2, 2003, Vladimir Couric, M.D., Chief of Inpatient Services of the Clinical Neuroscience Research Unit of the Medical School's Department of Psychiatry prepared a psychiatric evaluation for Pretrial Services which became Court Exhibit I to the sentencing hearing. Dr. Couric's comprehensive report concluded that Ms. Miller has Axis I disorders of (1) Pathological Gambling and

(2) Major Depressive Disorder, Moderate, Recurrent. Further, Ms. Miller scored 19 out of 20 points on a structured screening test for pathological gambling where a score of 5 or more points indicates pathological gambling.

According to PSR ¶ 59, Ms. Miller was an inpatient at the Institute of Living in 1990, having been hospitalized for treatment of major depression and anxiety as well as suicidal ideations. She also received mental health treatment while incarcerated at Niantic Correctional Institution during the early nineties. [Couric Report 10-11) Subsequent to her current arrest, Ms. Miller began receiving treatment for her gambling disorder and depression at the Wheeler Clinic, which includes weekly individual treatment sessions, weekly group sessions in its Gambling Intervention Group and psychiatric medications. See Devendorf letters in Attachment A hereto.

Ms. Miller was sentenced on November 6, 2003 to 60 months in prison, the maximum term for the offense, and full restitution. Amended Judgment. Although this Court found that Ms. Miller had a serious psychiatric illness, which it found to be a volitional impairment under U.S.S.G. § 5K2.13, it denied Ms Miller's application for a downward departure on the ground that the Second Circuit requires a direct connection between the mental disability and the offense, and this Court found there was no connection Ms. Miller's compulsion to gamble and her offense.

4

C. Appeal

The Court of Appeals rejected Ms. Miller's argument that this Court had applied an incorrect legal standard when it denied her application for a downward departure on the basis of diminished mental capacity pursuant to USSG § 5K2.13. The Court of Appeals also found that this Court's factual determination as to causation was not clearly erroneous. However, because Ms. Miller's counsel had objected below to the constitutionality of the then-mandatory Sentencing Guidelines, the Court remanded the case for resentencing in conformity with United States v. Booker and United States v. Fagans.

III. General Sentencing Considerations

The post-Booker sentencing regime differs in several important respects from the prior regime, most prominently in that the Sentencing Guidelines are no longer mandatory. Moreover, sentencing courts must now consider all of the goals and factors set forth in 18 U.S.C. § 3553(a), not just the guidelines and policy statements in the Guidelines Manual. United States v. Booker, 543 U.S. 220 (2005); United States v. Crosby, 397 F.3d 103 (2d Cir. 2005).

Section 3553(a) provides that the sentencing "court shall impose a sentence sufficient but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." The statute then sets out seven criteria the sentencing court needs to consider:

5

(1) the nature and circumstances of the offense and
the history and characteristics of the defendant;

(2) the need for the sentence imposed –
   (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
   (B) to afford adequate deterrence to criminal conduct;
   (C) to protect the public from further crimes of the defendant;
   (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for the defendant as set forth in the guidelines;

(5) any pertinent policy statement issued by the Sentencing Commission;

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

In <u>United States v. Crosby</u>, the Second Circuit explained that the sentencing court should follow a three-step process. First, the court should calculate the applicable guidelines range. Next, it should apply any appropriate departures from the range. Last, the court should consider the guideline sentence as well as all the other § 3553(a) factors to determine the sentence to impose. While the guideline

6

range is one of the § 3553(a) factors, it is not necessarily the controlling one. In United States v. Rattoballi, 452 F.3d 127 (2d Cir. 206) the Second Circuit cautioned that "[a] sentence must reflect consideration of the balance of the § 3553(a) factors; unjustified reliance upon any one factor is a symptom of an unreasonable sentence." Id. at 137.

Because the instant proceeding is a *de novo* sentencing, the district court must sentence a defendant as she stands before the court on the day of sentencing. United States v Bryson, 229 F. 3d 425, 426 (2d Cir. 2000); United States v. Core, 125 F.3d 74, 77 (2d Cir. 1997). Finally, when a case has been remanded for *de novo* sentencing, a defendant may raise issues in the district court which she had failed to raise in the first sentencing proceeding or even on initial appeal. United States v. Quintieri, 306 F.3d 1217 (2d Cir. 2002).

IV. Application of the § 3553(a) Factors

    A. Nature and Circumstances of the Offense:

As outlined above and in the Pre-sentence Report, Ms. Miller entered a guilty plea to one count of wire fraud arising out of her receipt of over four million dollars from a factoring concern called ACFC. During the six year period that she received funds from ACFC, the company was under the sole control of Kevin Morrison, its founder and Executive Vice President. As such, Mr. Morrison was able to transfer huge sums from ACFC to Ms. Miller's temporary staffing agency

7

while circumventing all accounting controls. Frequently, Mr. Morrison, who was a sophisticated businessman, disbursed funds to Ms. Miller's accounts even though Ms. Miller provided no documentation. By manipulating ACFC's accounts, Mr. Morrison was able to conceal discrepancies totaling millions of dollars from his superiors.

Considering their personal relationship and the vast amounts of money Mr. Morrison gave to Ms. Miller, Mr. Morrison must have been aware that Ms. Miller suffered from a gambling pathology, and that she was using these funds to fuel her illness. And it is reasonable to assume that, given Mr. Morrison's demonstrable business sophistication as well as his familiarity with the factoring business, it is probable that he was also aware that Ms Miller's representation that she was refinancing with Riveria Financing and would make good her huge indebtedness to ACFC, was untrue.[1] It does appear, therefore, from the facts set forth in the PSR, that Mr. Morrison was the controlling party in the offense and that Ms Miller's role in the offense was largely passive. Although Mr. Morrison's motivation for participating in the offense is not at issue here, there is a clear implication in the

---

[1] Contrasted with Mr. Morrison's business sophistication and familiarity with the factoring business, Ms Miller was a merely high school dropout. A-1 Staffing was her first attempt to start and run her own business. Moreover, Mr. Morrison was undoubtedly familiar with A-1 Staffing's operations and must have noticed that such a modest enterprise could not have generated the millions of dollars of account receivables that ACFC was allegedly securing.

PSR that he used ACFC's funds to induce Ms Miller to enter into a sexual relationship.

B. History and Characteristics of the Offender

In United States v. Lake, 419 F.3d 111, 114 (2d Cir. 2005), the Court noted that because the guidelines were no longer mandatory, a sentencing court could consider circumstances that would have formerly been prohibited grounds for departure. There are a number of aspects of Ms. Miller's history and personal characteristics which may have been formerly discouraged, but which now may be looked to support a non-guidelines sentence.

1. Post Arrest Rehabilitation

Since her arrest, Ms. Miller has made exceptional efforts towards rehabilitation. As detailed in a letter to the Court from Patricia A. Devendorf, the coordinator of the Bettor Choice Gambling Treatment Program at the Wheeler Clinic, Ms. Miller actively participated in a gambling treatment program for two years prior to her incarceration in March 2005. Specifically, during this period, Ms. Miller attended 95 treatment sessions at the clinic during that time, notwithstanding "a grueling treatment regimen for breast cancer." Moreover, Ms Miller has "achieved sustained abstinence from all forms of gambling." Ms. Devendorf also advised that Ms. Miller has made tremendous progress and maintains a continued commitment to work towards recovery. Ms. Devendorf

9

informs us, unfortunately, that during her incarceration Ms. Miller has been "unable to receive ongoing, gambling specific treatment," as there are no such programs available "within the existing program structure."

As part of her rehabilitation, Ms. Miller has completed her high school education, receiving her diploma on November 21, 2005. [Attachment B] She has also participated in all programs recommended by her unit team. She is currently assigned as a parenting clerk. Her supervisor states that "she does a fine job and demonstrates genuine interest in her job. Also, that she [takes] her work seriously and [is] reliable." She has taken and completed a number of courses and has maintained "clear conduct" at all times. [Attachment C: Progress Report prepared by Bureau of Prisons case manager Robert Kee on 6/13/06]

Ms. Miller has been an active church member for most of her life. Enclosed are a number of letters from members of her church and outreach groups she has participated in. [Attachment D] Some of these individuals have known Ms. Miller for twenty, thirty or forty years, and all of them have the highest regard for her despite her conviction and look forward to her return.

2. Ms. Miller's Deteriorating Health

As the Court may recall, before Ms. Miller began serving her sentence, she was diagnosed and treated for breast cancer. Although this Court granted several postponements of her surrender date to allow for surgery and radiation, Ms. Miller

10

was finally ordered to surrender on March 3, 2005. At that time, the Court found that the Bureau of Prisons would be able to monitor her treatment. Unfortunately, the efforts of the Bureau of Prisons, while probably well-meaning, have been dilatory at best, leaving extensive gaps between examinations and providing little or no treatment. Oddly, her case manager notes that Ms. Miller has no physical or mental health problems.

The medical records Ms Miller was able to produce[2] indicate that Ms Miller was not examined until November 2005. [Attachment E] Although results of this exam indicated some abnormalities, there was no follow-up until July 2006, at which time a radiology report indicates that nodules and/or calcifications have appeared in the opposite breast, lymph nodes are enlarged, multiple masses have appeared in the pelvis, and "hypodensities" have appeared on her liver. Notwithstanding this somewhat alarming report, which was prepared in July, Ms Miller was not re-examined until very recently.

Ms Miller is also suffering from gall bladder disease and has endured at least one very painful attack in recent weeks. The response of the prison medical staff was to advise her to eat a special diet. However, no such diet has been provided. In sum, considering Ms. Miller's age (57) history of breast cancer, strong familial history of breast cancer (mother and sister), suspicious radiology reports, and other

---

[2] The undersigned requested Ms Miller's medical records from Danbury Prison Camp on July 31, 2006, but has not received any response.

11

symptoms, Ms. Miller has received very limited and desultory health care during her incarceration.

Moreover, Ms Miller has received NO treatment for her gambling condition while incarcerated, although this Court's Judgment directed that "the defendant ... participate in all available services and mental health treatment to address gambling."

### 3. Ms. Miller's Pathological Gambling Condition

While the Court of Appeals concluded that this Court's rejection of Ms. Miller's pathological gambling as a ground for downward departure under U.S.S.G. § 5K2.13 was not clearly erroneous, this result does not bar consideration of this factor to the extent it is relevant under § 3553(a) (1) in this Court's formulation of a non-guideline sentence. United States v. Lake, *supra*.

Dr. Couric's extensive evaluation of Ms Miller's condition, and in particular, the section of his report labeled "Diagnostic Formulations and Conclusions," included a number of findings which clearly establish the relevancy of Ms. Miller's condition to her criminal conduct. First, Dr. Couric found, based on his analysis of her history and his professional understanding of her disease, that Ms. Miller's criminal conduct was definitely a symptom of her condition:

> Ms. Miller's use of gambling to escape feelings of depressed mood and low self-esteem, pattern of deceit to conceal the extent of her gambling and illegal activities, preoccupation with gambling as a way of solving her problems, increase in the

12

> amount and frequency of gambling, and illegal activities to finance her gambling meet DSM-IV-TR criteria for Pathological Gambling. Ms. Miller has a documented history of having a gambling problem since 1990 and has engaged in illegal activities such as issuing bad checks, larceny, and forgery to support her past gambling behaviors... . Pathological Gambling is characterized as an Impulse Control Disorder...[and] is the most severe pattern of destructive gambling behaviors... . Pathological gambling has also been conceptualized as a chronic medical condition similar to Obsessive-compulsive Disorder and Substance Addition.... [D]iminished decision-making abilities and impulse control in pathological gamblers is related to abnormal brain functioning... . [G]enetic factors also play an important role in the development of pathological gambling.

Dr. Couric also found that "Ms. Miller's pathological gambling, chronic symptoms of dysphoria, anxiety, and financial stressors were *significant contributing factors to the behaviors leading to her arrest.*" (Emphasis supplied). He noted that while "Ms. Miller's psychiatric condition and the stressors she experienced do not excuse her criminal behaviors in this case, [they] help to understand her vulnerability to such poor judgment."

In sum, there are a number of circumstances of the offense of conviction, as well as characteristics of the defendant which support defendant's argument that a non-guidelines sentence, set at a level well below the guideline sentence this Court was compelled to impose prior to Booker, is appropriate.

C. The Need for the Sentence Imposed

Among the mandates of 18 U.S.C § 3553(a)(2) is that the sentence should be "sufficient, but not greater than necessary" to satisfy the need "to provide the defendant with needed ... medical care, or other correctional treatment in the most effective manner." It is apparent from the foregoing discussion that Ms Miller's incarceration has prevented her from receiving the medical care she needs and the mental health treatment to address her gambling problem.

The sentence should also be sufficient "to protect the public from further crimes of the defendant." In other words, the risk of recidivism should be considered in formulating the sentence. It is well-established that the risk of recidivism drops dramatically with age, thereby lessening the need to protect the public from further crimes by the defendant. *See* United States Sentencing Commission, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines at 12 ("Recidivism rates decline relatively consistently as age increases," from 35.5% under age 21, to 9.5% over age 50.), available at http://www.ussc.gov/publicat/Recidivism. Ms. Miller is currently 57 years old. Thus she falls beyond the outer limit of the Sentencing Commission's recidivism study. Moreover, the likelihood of recidivism in this case is mitigated even further by Ms. Miller's voluntary pre-incarceration participation in 95 treatment sessions at the Wheeler Clinic and her efforts while in prison to obtain further treatment for her gambling pathology.

14

Regarding the need for the sentence to reflect the seriousness of the offense, the 16-month sentence imposed on Mr. Morrison, who was arguably more culpable than Ms. Miller, is itself an argument that a sentence lower than five years would serve the purposes of Section 3553(a)(2) in her case.

Finally, considering Ms Miller's serious medical needs, both physical and psychological, which have not been met during her incarceration, and that she has made exceptional efforts at rehabilitation, a non-guidelines sentence composed in whole or in part of home confinement is appropriate.

> D. <u>The Calculations Used to Determine Defendant's Criminal History Category are Incorrect.</u>

According the Ms. Miller's PSR, she has 9 criminal history points, placing her in Category IV. However, at least two of the points were improperly awarded. It appears that the offenses listed in ¶ 45 and ¶ 46 are related cases and should have been treated as one sentence for purposes of § 4A1.1. Second, the offense listed in ¶ 48 resulted in an unconditional discharge, which, at most, was a diversionary disposition and should not have been counted. Thus, there are at least two criminal history points which should not have been included. Moreover, there appears to be significant overlap between the incident described in ¶ 44 and the incident described in ¶ 47, such that it is difficult to discern what exactly occurred. The chronology is so totally disordered and confused that even the probation officer was unable to accurately describe the events in question. Finally, Ms. Miller

15

believes that she was not represented by counsel at several of the arraignments which have been counted. In sum, Ms Miller questions the accuracy and reliability of the PSR to the extent that it awarded her 9 criminal history points. Accordingly, it is respectfully requested that either the Probation Department provide a more accurate statement of her relevant criminal history or that Ms. Miller's criminal history score be reduced to Category III. Since her base offense level is 22, at Category III, her Guideline range would be reduced to 51-63 months.

In this regard, the Court should consider that Ms Miller received absolutely no benefit for her prompt acceptance of responsibility, since, due to her high criminal history category, her guideline range began a point higher than the statutory maximum sentence of five years. Some adjustment should be made to accommodate the loss of this benefit.

### F. There is an Unwarranted Sentencing Disparity Between the Ms. Miller's Sentence and that of her Co-Defendant.

The Second Circuit has recently indicated that it may be inclined to consider whether a sentencing court may consider co-defendant disparity within the same case as a proper ground for establishing a non-Guideline sentence. United States v. Toohey, 448 F.3d 542 (2d Cir. 2006); United States v. Fernandez, 443 F.3d 19 (2006). In this case there is clearly an unjustifiable disparity between the sentences

16

received by co-defendants Miller and Morrison.[3] The Government may argue that Morrison's criminal history category was I and Miller's was IV provides sufficient justification for the vast disparity between the sentences, but the disparity remains even if this factor is discounted. Since Mr. Morrison's offense conduct was the same or even more culpable than Ms Miller's, it can be fairly assumed that his offense level was also 22. At criminal history category I, his sentence should have been 41-51 months. However, his actual sentence was 16 months, thereby allowing for a substantial downward departure. There is no factual support in the record to justify such a difference. If any disparity were justified, given Mr. Morrison's position of trust, Ms. Miller's documented diminished capacity, psychiatric history, lower educational attainment and other vulnerabilities, it would be far more equitable for the sentencing disparity to run in Ms. Miller's favor rather than the reverse.

### G. Conclusion

The previous sentencing hearing was held on November 6, 2003, well before Booker was decided. At that time, this Court addressed the defendant, stating, "...Congress has determined your sentence because they have said I must sentence you within the guidelines. ...I don't know if that's the sentence I

---

[3] Because Mr. Morrison's PSR is not available to the undersigned, this section is based entirely on an extrapolation from the facts of Ms. Miller's offense as set forth in her PSR, as well as the computations therein.

17

would have given you if I were free to sentence you to something else... ." [Sentencing Transcript at page 71] This Court is no longer bound by the rigidities of the Sentencing Guidelines and on this *de novo* sentencing may impose a lower, non-guideline sentence. It is respectfully argued that, for the foregoing reasons and for any other reasons apparent in the record, this Court should impose a sentence in keeping with the mandate that it be one sufficient, but not greater than necessary, to comply with the purposes set forth in §18 U.S.C. 3553 (a).

It is further requested, that because of Ms. Miller's untreated medical conditions and her need for further counseling so as to overcome her gambling pathology, all or a portion of her sentence be served under home confinement, a halfway house or some other form of community confinement.

                                               Respectfully Submitted,

                                               Eileen F. Shapiro
                                               Attorney for Defendant Mildred Miller
                                               45 Washington Street #160
                                               Brooklyn, NY 11201
                                               718-254-9049

Dated: September 14, 2006